Roger M. GORDON, Plaintiff-Appellee,

v.

VINCENT YOUMANS, INC. and Miller Music Corporation, Defendants-Appellants.

No. 142, Docket 29948.

United States Court of Appeals Second Circuit.

Argued Nov. 3, 1965.

Decided Dec. 20, 1965.

Timbers, District Judge, dissented.

Edward M. Cramer, New York City (Herbert Stern, New York City, on the brief), for appellee.

Julian T. Abeles, New York City (Robert C. Osterberg, New York City, of counsel), for appellant, Miller Music Corp.

Donald R. Seawell, Melvin J. Zalel, Bernstein, Seawell & Kaplan, New York City, on the brief, for appellant, Vincent Youmans, Inc.

Before KAUFMAN and HAYS, Circuit Judges, and TIMBERS, District Judge.*

HAYS, Circuit Judge:

This is a diversity action in which plaintiff-appellee, the son of lyric writer Mack Gordon, seeks a declaratory judgment establishing him as a 50% owner of a ⅓ interest in the renewal copyright of the musical composition "Time On My Hands, You In My Arms." "Time On My Hands" was composed by Vincent Youmans; Mack Gordon collaborated with Harold Adamson on the lyrics. A partial summary judgment was awarded to appellee on the ground that there was no valid and subsisting assignment from Mack Gordon to either of the appellants.[1] Upon an express determination that there was no just reason for delay, the court expressly directed the entry of final judgment. Rule 54(b) of the Federal Rules of Civil Procedure.

■ Appellee's summary judgment motion was predicated upon documentary exhibits and the affidavits of his attorney. The Supreme Court has recently said: "On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). With this admonition in mind, we find that the inferences to be drawn from the facts do not support the granting of summary judgment. We therefore reverse and remand for a trial of the issues.

On August 12, 1930, Mack Gordon assigned to appellant, Vincent Youmans, Inc., all rights, including renewal copyrights, in any song that he might write. On March 11, 1931, two separate documents, a release between Gordon and Vincent Youmans, Inc. and an assignment by Gordon to appellant, Miller Music Corporation, of the rights to nineteen

named songs were executed. "Time On My Hands" was not included in this latter group. On September 10, 1931, Vincent Youmans, Inc., purported to assign its rights in "Time On My Hands" to Miller Music Corporation.

The August 12, 1930 assignment reads:

"The Lyric Writer agrees for himself, if living, and for his administrator, executors and next of kin, if not living, to renew, pursuant to law, the copyrights of each and all of the numbers delivered to the Publisher and copyrighted by the Publisher hereunder, and to assign such renewals of copyright to the Publisher for continued publication pursuant to the provision hereof."

"Time On My Hands" was included in the assignment.

There is no dispute about the meaning or scope of the agreement of August 12, 1930. There is, however, a dispute as to its continued existence. Appellee properly asks why royalties were never paid and royalty statements never rendered to Mack Gordon as required by the agreement. He quotes Miller Music Corporation's attorney as stating that the agreement was cancelled. On the other hand, appellants ask why Gordon never exhibited an interest in "Time On My Hands" or claimed the right to royalties.

Appellants allege that Gordon executed a release, now missing, in which he renounced all rights to royalty payments for "Time On My Hands." The affidavit of John F. Fitzgerald, controller of Miller Music Corporation, indicated that he had "found correspondence in the files * * referring to said document." The status of the case as we see it requires that the factual questions presented here be resolved in the district court after a full trial.

■■ Even more important in their bearing on the rights to "Time On My Hands" are the two agreements of March 11 and the agreement of September 10,

---

* Chief Judge of the District Court of Connecticut, sitting by designation.

1. Appellee also demanded an accounting for royalties received by Miller Music Corporation on the renewal copyright.

1931. New York law, which is applicable in this diversity action, requires that all writings that form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties. Kurz v. United States, 156 F.Supp. 99, 103–104 (S.D.N.Y.1957), aff'd *per curiam*, 254 F.2d 811, 812 (2d Cir. 1958); Nau v. Vulcan Rail & Construction Co., 286 N.Y. 188, 36 N.E.2d 106 (1941).

In Kurz, where the District Court held that the law of New York was to be applied, the documents read together were a "Separation Agreement," between decedent and his wife, dated October 16, 1931 and a "Trust Instrument," between decedent and his trustee, dated December 4, 1931. This Court observed, in affirming *per curiam*, "it is both good sense and good law that these closely integrated and nearly contemporaneous documents be construed together." Kurz v. United States, 254 F.2d 811, 812 (2d Cir. 1958). In Nau three agreements were read together in order to determine whether the defendant was liable for expenses incurred by plaintiff in defending a patent interference proceeding. The court concluded that the three agreements "were executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as one." Nau v. Vulcan Rail & Construction Co., 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (1941); see In re Herzog, 301 N.Y. 127, 135–136, 93 N.E.2d 336, 339 (1950); Knowles v. Toone, 96 N.Y. 534, 536 (1884); Restatement of Contracts § 235(c); 4 Williston, Contracts § 628 at 904 (3d ed. 1961); cf. Marsh v. Dodge, 66 N.Y. 533, 537–538 (1876).

The language of the March 11, 1931 release is broad, but when taken in the context of all three agreements its meaning is not clear. Vincent Youmans, Inc., released Mack Gordon "from all manner of action and actions * * * covenants, contracts * * * from the beginning of the world to the day of the date of these

presents." The release was predicated upon a payment of consideration, "lawful money * * * to [Youmans, Inc.,] * * * by Mack Gordon." However, the assignment, also signed on March 11, between Gordon and Miller Music Corporation recited:

"the Authors were heretofore under contract to Vincent Youmans, Inc. in respect to the foregoing musical numbers listed in 'Schedule A', from which contracts the Publisher had obtained releases for the Authors by the payment of substantial consideration * * * The procurement of such release by the Publisher together with the provision for the payment of royalties to the Authors hereunder and the other agreements on the part of the parties hereto constitute the consideration of this agreement."

■■ No particular form of words is required to make a written release effective; all that is necessary is that the words show an intention to discharge. The scope and meaning of a release will be determined by the manifested intent of the parties—in Corbin's words, "by the process of interpretation, just as in the case of determining the meaning of an executory contract." 5A Corbin, Contracts § 1238 at 560 (1964).

Here, the recital in the contemporaneous assignment casts doubt upon the purpose and meaning of the release. See Television Credit Corp. v. International Television Corp., 279 App.Div. 561, 107 N.Y.S.2d 179, 180 (1951). The release expressly calls for a payment from Gordon to Youmans; the assignment makes clear that Miller Music Corporation, not Gordon, was to supply the consideration for the release. "Time On My Hands" was not included in Schedule A of the assignment. Why should Miller Music Corporation pay for the release of a composition the rights to which it was not receiving? It seems not unlikely that the assignment indicates that the broad language of the release was mere boiler plate. One might reasonably conclude that the parties intended to limit the re-

lease to the compositions listed on Schedule A.

On September 10, 1931 Vincent Youmans, Inc., assigned the copyright interest that it obviously assumed it had in "Time On My Hands" to Miller Music Corporation. Clearly, then, neither Vincent Youmans, Inc., the granting party in the March 11 release, nor Miller Music Corporation, the third party supplying the consideration for the release, intended or believed that the release was all-encompassing.

■ Where ambiguity is present in a contract, the subsequent conduct of the parties may be used to indicate their intent. See Town of Pelham v. City of Mount Vernon, 304 N.Y. 15, 23, 105 N.E. 2d 604, 608 (1952); Seymour v. Warren, 179 N.Y. 1, 6, 71 N.E. 260, 261 (1904) ("There is no better way of ascertaining the meaning and construction of a written contract than to look at the acts and conduct of the parties under it."); 1 Corbin, Contracts § 101 (1964). From September 10, 1931 until his death in February 1959, Mack Gordon never exhibited any interest in what appellee now alleges was his undisputed property. Certainly, from his conduct, an inference may be drawn that Gordon believed that the release was limited to the songs in Schedule A, and that the Youmans' assignment of September 10 was, therefore, effective.

■ We believe that these doubts as to the meaning of the release and the two assignments preclude summary judgment. The three agreements present a confusing picture. The case must be remanded for a trial of the facts in order to resolve the doubts. There is no other way to establish the true intent of the parties.

Mack Gordon died in February 1959, almost four months after the copyright renewal term began and more than fifteen months after the beginning of the period during which the right to renewal was in effect. (The copyright may be renewed "within one year prior to the expiration of the original term of copyright." 17 U.S.C. § 24.) Appellee's rights were not distributed by the executor until February 15, 1963; this action was not instituted until August 5, 1963. Thirty-two years elapsed before the appellants' rights were challenged. During the intervening period Vincent Youmans and others with first-hand knowledge of the transaction died; documents that might have been helpful were lost.[2] The rights under the original and renewal copyrights stem from the same source, and claims under one are inextricably tied to the other. The appellants may have been prejudiced by the delay. The fact that appellee has sued only on the renewal copyright does not preclude a finding of laches. Though we do not intend by this discussion to intimate any opinion on the subject, the district court on remand may find it necessary to consider the issue.

Reversed and remanded.

TIMBERS, District Judge (dissenting):

If I thought that remand to the district court for a full trial would be conducive to "a search for the truth," cf. Dressler v. MV Sandpiper, 331 F.2d 130, 134 (2 Cir.1964), I would be for it. Since I am convinced, under the circumstances here presented, that a trial would be wholly unproductive and is neither necessary nor appropriate, I respectfully dissent.

The critical transactions occurred 34 to 35 years ago. The contemporaneous documents reflecting those transactions are before us, as they were before the district court, for construction. Mack Gordon and Vincent Youmans, two key parties to the transactions, are dead. Representatives of the corporate appellants, none of whom was in on the critical events of three decades ago, have shed what light they can, particularly as to the existence or non-existence of documents. Appropriate disclosure proceedings have been had, including depositions. There are no available witnesses, so far as we

---

2. See, e.g., the discussion of the missing release, supra.

have been informed, who can testify to any relevant facts. To remand for trial, it seems to me, is to invite unnecessary prolongation of the abortive battle between counsel reflected in the argumentative, conclusory affidavits before us. The result, I fear, will be a compounding of the confusion which the majority has noted.

More important, I believe that this controversy can and should be adjudicated on the basis of the contemporaneous documents now before us. While they may not be as clear as we with the benefit of hindsight should like to have them, they are sufficiently so, in my view, to permit a judicial declaration of not what the parties meant to say, but what they meant by what they did say. I would affirm the declaratory judgment of the district court, 245 F.Supp. 607, that appellee is a 50% owner of a ⅓ interest in the renewal copyright.

### AGREED FACTS AND ISSUE TO BE DETERMINED

All agree that Mack Gordon, in collaboration with Harold Adamson, wrote the lyrics and Vincent Youmans composed the music for the musical composition "Time On My Hands, You In My Arms" which originally was copyrighted on October 31, 1930 as an unpublished work and on December 16, 1930 as a published work.[1] All agree that upon expiration of the original 28 year copyright term and after filing a timely renewal copyright claim, the renewal copyright term of the musical composition began November 1, 1958 and is presently in effect. All agree that since original publication of the composition on December 10, 1930, through the entire original copyright term and through the renewal copyright term to the present date, the composition has been published and exploited by appellants as one of the all time favorites. All agree that during this entire period, despite appellants' publication and exploitation of the composition, they have neither accounted, nor paid royalties, to Gordon during his lifetime, nor to his son as assignee since Gordon's death.

Since appellee seeks a declaratory judgment with respect to Gordon's interest in the renewal term of the copyright and an accounting for royalties during the renewal term,[2] the crux of the controversy we are called upon to decide is: Who was entitled to the renewal copyright interest in the composition when the renewal term began November 1, 1958? Unless there was a valid and subsisting assignment from Gordon to either of the appellants, the renewal interest belonged to Gordon as the lyric writer and belongs today to his son, pursuant to Section 23 of the Copyright Act of 1909, 17 U.S.C. § 24. Determination of whether Gordon assigned his interest and whether either of the appellants acquired such interest turns upon construction of four, and possibly five,[3] documents entered into dur-

---

1. In this opinion, "Time On My Hands, You In My Arms" will be referred to as the "musical composition"; Mack Gordon, co-author of the lyrics and father of appellee, as "Gordon"; Harold Adamson, co-author of the lyrics, as "Adamson"; Vincent Youmans, composer of the music and formerly president of Vincent Youmans, Inc., as "Vincent Youmans"; appellant Vincent Youmans, Inc., as "Youmans"; and appellant Miller Music Corporation, successor to Miller Music, Inc., as "Miller".

2. Appellee also claims an accounting for royalties during that portion of the original copyright term not barred by the statute of limitations. That issue is not before us on this appeal.

3. The fifth document referred to is a draft agreement of December 18, 1930 intended for execution by Gordon and Youmans; although apparently executed by Youmans, it was never executed by Gordon. It is included in the summary that follows.

While appellants' counsel makes reference to a sixth document—a purported release given subsequent to the December 18, 1930 "agreement" by Gordon to Youmans releasing the latter from any obligation to pay royalties on the musical composition—he notes also that the only persons who could verify execution and delivery of such release, Gordon and Vincent Youmans, are dead. This is an example of precisely the type of "release"

ing 1930 and 1931: (1) an agreement of August 12, 1930 between Gordon and Youmans; (2) a draft agreement (never executed by Gordon) of December 18, 1930 between Gordon and Youmans; (3) a general release of March 11, 1931 from Youmans to Gordon and Harry Revel; (4) an agreement of March 11, 1931 between Gordon and Revel and Miller; and (5) an agreement of September 10, 1931 between Youmans and Miller. A brief summary of the pertinent provisions of these documents is necessary to our construction of their composite meaning and effect, upon which turns the decision of the critical issue before us.

CONTEMPORANEOUS DOCUMENTS READ TOGETHER

*August 12, 1930 Agreement*

By the terms of this agreement between Youmans as "Publisher" and Gordon as "Lyric Writer", Gordon assigned to Youmans all rights in musical compositions which he might write alone or in collaboration with others and agreed to assign the renewal rights. Gordon agreed specifically to write, in collaboration with Harry Revel and Adamson, the words and/or music for a play "Playing Around" especially procured for them by Youmans.

Gordon agreed during the term of the agreement to work exclusively for Youmans, not to write lyrics or collaborate with others in composing music except for Youmans and not to become a member of the American Society of Composers and Authors. After the first week of January 1931, Gordon was to receive a drawing account of $50 per week, to be deducted from the royalties payable to him under the agreement.

Youmans agreed to a scale of royalties, to furnish Gordon quarterly royalty statements 30 days after the first of April, July, October and January of each year and to pay Gordon the sums thus shown to be due, the agreement to be terminated

upon 60 days default in the payment of royalties.

The agreement was for a period of 18 months (thus expiring January 12, 1932), with an option in Youmans to renew for one year upon 30 days notice to Gordon.

*December 18, 1930 Agreement*

This agreement, although part of the record before us, appears to have been signed only by Vincent Youmans as president of Youmans, but not by Gordon.

It purported to cancel the August 12, 1930 agreement between the same two parties. It recited that Gordon had submitted under the terms of the August 12 agreement, and Youmans had accepted, nineteen songs listed by titles. "Time On My Hands" appears to have been inserted, not in the listing of the other nineteen songs, but to the right of one of those listed.

It provided for a slightly different scale of royalties, acknowledged that Gordon had received $60 as an advance against royalties due him under the August 12 agreement and included the same provision by which Youmans was to furnish quarterly statements and to pay royalties quarterly to Gordon. It contained the same termination provision in the event of default for 60 days in the payment of royalties and the same agreement to assign renewal rights.

*March 11, 1931 General Release*

This general release, from Youmans (signed by Vincent Youmans, President) to Gordon and Harry Revel, is on the standard New York printed form of general release for a corporation. The name of Harold Adamson as one of the releasees was stricken out in three places. The acknowledgment was executed by Max Chopnick, a prominent New York attorney.

*March 11, 1931 Agreement*

This agreement, between Harry Revel and Gordon as "Authors" and Miller as

that is not susceptible of proof by parol evidence. Its injection on the instant motion for summary judgment was wholly improper and completely ineffective, in

my opinion, in its obvious purpose of attempting to create a triable issue of fact. Infra, p. 275.

"Publisher", recited that the authors, in collaboration with Adamson, had written the music and lyrics for certain musical compositions, "a complete list of which is hereunto annexed and marked 'Schedule A' ", in which schedule was not included "Time On My Hands". It recited that the authors were about to write the music and lyrics for a musical show entitled "Who's Who" (Ziegfeld Follies) to be produced by Florenz Ziegfeld. It further recited that the publisher desired to acquire from the authors the sole and exclusive rights with respect to the musical numbers listed in Schedule A and similar rights with respect to the musical numbers which might be written by them and accepted for the Play (Who's Who). Finally, it recited that the authors heretofore had been under contract to Youmans with respect to the musical numbers listed in Schedule A, and that the publisher had obtained releases for the authors from those contracts "by the payment of substantial consideration".

The agreement provided for assignment by the authors to the publisher of the musical numbers listed in Schedule A and those musical numbers which the authors either alone or in collaboration with others might write for the Play. The authors reserved to themselves the exclusive right with respect to musical numbers to be rendered and performed upon the living stage in the Play. The publisher was granted the right to publish and copyright the musical compositions listed in Schedule A and/or accepted for use in the Play and the authors agreed to assign the renewal rights.

Upon the subject of consideration, the agreement provided:

"The Publisher has paid to Vincent Youmans, Inc. a substantial amount and has agreed to pay substantial royalties in order to procure a release from Vincent Youmans, Inc. of any rights which it may have against the Authors. The procurement of such release by the Publisher together with the provision for the payment of royalties to the Authors hereunder and the other agreements on the part of the parties hereto constitute the consideration of this agreement."

The authors warranted that the musical compositions delivered to the publisher and listed in Schedule A, as well as those which might be written for the Play, were original works capable of copyright protection, were not in the public domain and were not copies or imitations of other prior copyrighted works. With respect to the musical compositions listed in Schedule A, the authors warranted that "each and every part thereof are owned by the Authors free and clear of any claim of whatsoever kind on the part of any person, firm or corporation in respect thereto". With respect to both the Schedule A and Play compositions, the authors warranted that neither of them had "at any time heretofore entered into any agreement or arrangement for the publication or mechanical reproduction of said musical compositions or any of them or any part thereof, except that the Authors heretofore made a contract with Vincent Youmans, Inc. in respect to the musical compositions listed in 'Schedule A' from which contract they have been released by the said Vincent Youmans, Inc."

The agreement provided for quarterly accountings for royalties to be paid 30 days after the first of January, April, July and October during the term of the copyright and any renewal or extension thereof.

The agreement also provided that the publisher would forward checks in payment of sums due under the agreement, together with statements of accounts due, to their agent Lou Irwin.

A photostatic copy of the agreement shows that it was signed by Gordon, Harry Revel and Charles Miller (on behalf of Miller) and either signed or witnessed by Lou Irwin and Max Chopnick.

*September 10, 1931 Agreement*

By the terms of this agreement between Youmans as "Assignor" and Miller as "Assignee", Youmans assigned an undivided one-half interest in "Time On

My Hands" to Miller. The assignment was limited to the American and Canadian copyright interests in the composition, the foreign copyright interests being reserved to Youmans.

*Youmans did not assign, or even purport to assign, the renewal copyright interests in the composition to Miller or to anyone else.*

The agreement recited that Youmans was "the sole owner of the copyright of the certain musical composition entitled 'TIME ON MY HANDS', lyrics by Harold Adamson and Mack Gordon, music by Vincent Youmans". Youmans "represents and warrants that it has the absolute right to make this agreement; that it is the sole and absolute owner of the rights and property herein assigned to [Miller]; that said rights and property are free and clear of any and all claims and demands whatsoever; that the Musical Composition is an original composition which does not infringe upon any other copyrighted work". Youmans "agrees to pay any and all royalties which may be due to the authors and composers of the Musical Composition as well as such royalties as may be due to any producer or manager entitled thereto upon the Musical Composition and to save [Miller] harmless from any claims or demands for royalties made by any person, firm or corporation whatsoever other than [Youmans, Inc.]"

It provided for royalties to be paid by Miller to Youmans, $1500 being paid in advance on account of such royalties, upon sales of the composition in the United States and Canada, which royalties were to be reduced when the composition ceased to be "a featured number of the current 'ZIEGFELD FOLLIES', or/and any other production".

It recited that Youmans had assigned to Campbell Connelly, Ltd. of London, all foreign rights to "its catalogue (which catalogue includes the Musical Composition)", for which Youmans had received $25,000 as an advance against royalties under that assignment; and that after Youmans had earned the $25,000 in full, it would pay Miller one-half of all royalties received from the assignment of the foreign rights to the composition.

It provided for quarterly accountings and payments of royalties 30 days after the first of March, June, September and December of each year.

It provided that the following statement shall appear on the title page of the composition: "Published by Miller Music, Inc. by arrangement with Vincent Youmans, Inc."

Finally, it provided for Youmans "to execute simultaneously herewith the formal assignments annexed hereto of undivided one-half interests in the American and Canadian copyrights of the Musical Composition." [4]

In analyzing the foregoing documents to determine whether there was a valid and subsisting assignment of Gordon's renewal copyright interest which had been acquired by either of the appellants at the beginning of the renewal term, it is appropriate to follow the canon of construction stated by the majority, namely, to construe together closely integrated and nearly contemporaneous documents which form part of a single transaction and are designed to effectuate the same purpose, even though they were executed

---

4. "ASSIGNMENT OF COPYRIGHT

KNOW ALL MEN BY THESE PRESENTS that for and in consideration of the sum of One Dollar and other good and valuable consideration received of MILLER MUSIC, INC., hereinafter called the 'Assignee', the undersigned VINCENT YOUMANS, INC., hereinafter called the 'Assignor', does hereby bargain, sell, assign, set over and transfer to and unto the said Assignee, its successors and assigns, an undivided one-half interest in and to the United States copyright of the musical composition entitled 'TIME ON MY HANDS', lyrics by Harold Adamson and Mack Gordon, music by Vincent Youmans.

IN WITNESS WHEREOF, the undersigned has caused these presents to be executed by its duly authorized officer and its corporate seal to be affixed this 10th day of September, 1931.

VINCENT YOUMANS, INC.
By Vincent Youmans
President"

on different dates and were not all between the same parties. Kurz v. United States, 156 F.Supp. 99, 103–104 (S.D.N. Y. 1957), aff'd per curiam, 254 F.2d 811, 812 (2 Cir.1958); Nau v. Vulcan Rail & Construction Co., 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (1941). Since here our purpose is to ascertain the title to Gordon's ⅓ interest in the renewal copyright interest in the musical composition, insofar as the documents may disclose it, I would read together the five documents referred to above which cover the period from August 12, 1930 to September 10, 1931.

The documents, upon analysis and read together, disclose this picture with reasonable clarity:

(1) Their dominant purpose was to provide songs for specified musicals and plays, then in production or about to be produced, and to protect the publishers in their use of such songs; the musicals and plays are specified as "Playing Around" (August 12 agreement), "Who's Who" (Ziegfeld Follies) (March 11 agreement) and "Ziegfeld Follies" (September 10 agreement).

(2) The dominant purpose of the documents does not appear to have been the granting of renewal copyright interests in the songs; and in the only document which specifically refers to the musical composition here in question (September 10 agreement), there is no mention of renewal rights, although boiler plate provisions granting renewal rights are in the August 12 and March 11 agreements.

(3) The interest of Adamson as the co-author (with Gordon) of the lyrics in the musical composition is indicated throughout the documents: he is referred to in the August 12 agreement as about to collaborate with Gordon and Revel in writing the "words and/or music * * * for a play especially procured for them by [Youmans], now known as 'Playing Around' "; he is referred to in the March 11 agreement as having collaborated with Gordon and Revel in writing the music and lyrics in the songs listed on Schedule A; he is referred to in the September 10 agreement as having written, with Gordon, the lyrics for the musical composition; and, of particular significance, his name is stricken out as a releasee in the general release of March 11 from Youmans to Gordon and Revel (executed the same day as the agreement between Gordon and Revel and Miller).

(4) The absence of Adamson as a party to the March 11 agreement between Gordon and Revel and Miller, together with the absence of the musical composition as one of the songs assigned to Miller by that agreement—and the reasons for the absence of both co-author and song from that agreement—are of special significance in shedding light on the critical issue before us. Obviously Miller wanted publication rights to that song in connection with one of the Ziegfeld Follies shows then under production; and in fact 6 months later did obtain *the rights of Youmans*, by the agreement of September 10, in that song which by then was "a featured number of the current 'Ziegfeld Follies' ". But by the agreement of March 11, Miller wanted the "sole and exclusive" rights of the authors (Gordon and Revel) to the songs it was acquiring; it spelled out in detail the consideration for such acquisition as not only the promise to pay substantial royalties to the authors but the procurement, for a substantial amount, of the authors' release from any rights Youmans might have against them; and, of crucial significance, it obtained from the authors elaborate warranties that the songs it was acquiring were original works capable of copyright protection, were not in the public domain, were not copies or imitations of other prior copyrighted works, that "each and every part thereof are owned by the Authors free and clear of any claim of whatsoever kind on the part of any person, firm or corporation", that "the Authors have not nor has either of them at any time heretofore made or entered into any agreement, contract or arrangement which will or can prevent [Miller] from holding and possessing the full rights herein conveyed" (except their contract with Youmans from which they

had been released), and the authors agreed to "protect and defend the right, title and interest in and to the aforesaid musical compositions and each and every one of them herein conveyed to [Miller] to the fullest extent and agree to fully indemnify and save [Miller] harmless of and from any claims of whatsoever kind or nature". It would be the understatement of the musical century to say that, absent Adamson as a party to the March 11 agreement with Miller, Gordon was in no position to make such representations and warranties with respect to the musical composition in which Adamson had an interest as co-author of the lyrics. Whatever the *reason* for Adamson's absence as a party to the March 11 agreement with Miller and whatever the *reason* for his name being stricken as a releasee in the release from Youmans of the same date, while such reasons may well be relevant to our inquiry, the critical point is that there could be no assignment to Miller of the sole and exclusive rights of Gordon in the composition free and clear of any claim on the part of any other person without Adamson joining in the assignment. Miller's insistence upon iron-clad warranties from Gordon and Revel explains also the three-way transaction of March 11; otherwise, why would it not have been sufficient for Youmans to have assigned directly to Miller its interest in the 19 named songs on Schedule A, particularly since Miller was paying for them? Clearly, Miller was demanding from Gordon and Revel with respect to the 19 songs assigned what Gordon did not have the power to grant with respect to the musical composition in question— any more than Youmans could by the September 10 assignment.

(5) By the same token, the September 10 agreement conveyed to Miller nothing more than a half of the ⅓ interest of Youmans in the musical composition derived from Vincent Youmans as the composer of the music. Despite the all too transparent puffing in the September 10

document regarding Youmans being the "sole owner of the copyright", that it "has the absolute right to make this agreement", that it "is the sole and absolute owner of the rights and property herein assigned", that "said rights and property are free and clear of any and all claims and demands whatsoever" and that it "agrees * * * to save [Miller] harmless from any claims or demands for royalties made by any person, firm or corporation whatsoever other than [Youmans]"—the stark fact remains, leaving Gordon's interest aside for the moment, that Youmans, without Adamson's interest, could not make an effective assignment as "the sole owner of the copyright."

(6) As for Gordon's initial copyright interest, assuming it was acquired by Youmans under the executory assignment of August 12—despite the facts that by its terms it expired at the end of 18 months, that concededly no payments were ever made thereunder to Gordon (the promise of such payments being the sole consideration for the executory assignment [5]), that the assignment was never recorded as required by Section 44 of the Copyright Act, 17 U.S.C. § 30, and that appellants' counsel have vehemently proclaimed that such assignment had been cancelled—nevertheless even if the initial copyright interest had been acquired by Youmans sometime prior to the song's being copyrighted as an unpublished work on October 31 and as a published work on December 16, under the analysis of the documents detailed above it is abundantly clear that whatever interest Youmans had acquired was returned to Gordon by the general release of March 11.

(7) And by the assignment of September 10, Youmans, although purporting to grant to Miller an undivided one-half interest in the musical composition and in the American and Canadian copyright interests therein, actually could grant no more than it had, namely, the ⅓ interest

---

5. "* * * it has been universally held that a mere promise to pay [royalties] does not constitute a valuable considera-

tion within the recording acts." Rossiter v. Vogel, 134 F.2d 908, 911 (2 Cir. 1943).

it had derived from the composer; it assigned half of what it had the power to assign.

(8) Finally, Youmans, by the assignment of September 10, did not grant, or even purport to grant, the *renewal copyright interest* in the composition to Miller. In view of the provisions covering renewal rights in each of the earlier agreements, including the March 11 agreement in which Miller's interests were not exactly slighted, the omission of such provision from the September 10 agreement is strong corroboration, if any be needed, for the belief that Youmans did not grant and Miller did not acquire by that assignment any rights whatsoever in Gordon's interest in the musical composition, much less in his renewal copyright interest.

The September 10 assignment, although ineffective as an assignment of Gordon's rights, was valid as an assignment of Youmans' rights and Miller therefore had the power to renew the copyright as grantee of one-half of Youmans' one-third interest in the musical composition, as the district court correctly held. 245 F.Supp. 607, 609–610. Tobias v. Joy Music, Inc., 204 F.Supp. 556, 559 (S.D. N.Y. 1962); cf. Rose v. Bourne, Inc., 279 F.2d 79, 80–81 (2 Cir. 1960), cert. denied, 364 U.S. 880, 81 S.Ct. 170, 5 L.Ed. 103 (1960); Rossiter v. Vogel, 134 F.2d 908, 911 (2 Cir. 1943). In renewing the copyright, Miller acted in its capacity as constructive trustee on behalf of the other co-owners, including Gordon. Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 223 F.2d 252, 253 (2 Cir. 1955), modifying 221 F.2d 569 (2 Cir. 1955); Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 266, 267–268 (2 Cir. 1944); Silverman v. Sunrise Pictures Corporation, 273 Fed. 909 (2 Cir. 1921), modified on other grounds, 290 Fed. 804 (2 Cir. 1923); Edward B. Marks Music Corp. v. Wonnell, 61 F.Supp. 722, 727 (S.D.N.Y. 1945).

Miller's fiduciary power to renew on behalf of the other co-owners, including Gordon, of course was not coupled with an immunity against their claims for royalties.

### APPLICABLE STANDARDS IN CONSTRUING ASSIGNMENT OF RENEWAL COPYRIGHT INTERESTS

Principles of contract law generally are applicable in the construction of copyright assignments, licenses and other transfers of rights. Clark v. West, 137 App.Div. 23, 122 N.Y.S. 380 (2nd Dept. 1910), aff'd, 201 N.Y. 569, 95 N.E. 1125 (1911); Hart v. Cort, 83 Misc. 44, 144 N.Y.S. 627 (App. Term, 1st Dept. 1913). For example, where an assignee has prepared the assignment, absent clear evidence of a contrary intent, rights not expressly granted will be held to have been reserved by the assignor. Warner Bros. Pictures v. Columbia Broadcasting System, Inc., 216 F.2d 945, 949 (9 Cir. 1954), cert. denied, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756 (1955), and authorities cited. Id. at 949 n. 3.

Specifically, in construing an assignment transferring renewal copyright interests, we have held that "the circumstances justifying the transfer of the right of renewal must be stronger than those justifying the transfer of the copyright, since the right of renewal is separate from the original copyright." Rossiter v. Vogel, 134 F.2d 908, 911 (2 Cir. 1943), citing Shapiro, Bernstein & Co. v. Bryan, 123 F.2d 697 (2 Cir. 1941). And the Supreme Court, in the leading case of Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 653–654, 63 S.Ct. 773, 777–778, 87 L.Ed. 1055 (1943), referring to "the basic consideration of policy underlying the renewal provision of the Copyright Act of 1909 [17 U.S.C. § 24]", stated that "By providing for two copyright terms, each of relatively short duration, Congress enabled the author to sell his 'copyright' without losing his renewal interest".[6]

6. The "basic consideration of policy underlying the renewal provision of the Copyright Act of 1909" is reflected in the much quoted report of the House commit-

The courts of this Circuit consistently have recognized and have given practical application to the distinction between the right of renewal and the original copyright. Cf. Miller Music Corporation v. Charles N. Daniels, Inc., 158 F.Supp. 188 (S.D.N.Y. 1957), aff'd, 265 F.2d 925 (2 Cir. 1959), aff'd, 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960); Gibran v. Alfred A. Knopf, Inc., 153 F.Supp. 854 (S.D.N.Y.1957), aff'd, 255 F.2d 121 (2 Cir. 1958), cert. denied, 358 U.S. 828, 79 S.Ct. 47, 3 L.Ed.2d 67 (1958).

In Philipp v. Jerome H. Remick & Co., 145 F.Supp. 756 (S.D.N.Y.1936), cited with approval in Warner Bros. Pictures v. Columbia Broadcasting System, Inc., supra at 949, Judge Bondy was called upon to construe several agreements pursuant to which it was claimed that because they granted "the right to copyright" they must have assigned "the entire copyright". In rejecting this contention and holding that whatever rights were given to the publisher must be construed with reference to the prior copyright and the contemplated use of the songs in the performance of the operetta, Judge Bondy stated (Id. at 758):

"Such a construction would give effect to all the terms of the agreements. A larger meaning may have been intended, but the purposes of the parties are left in doubt. Such doubt as there is should be resolved in favor of the composer. The clearest language is necessary to divest the author of the fruits of his labor. Such language is lacking here."

tee which submitted the legislation, H.R. Rep.No.2222, 60th Cong., 2d Sess. 14–15 (1909):

"Your committee, after full consideration, decided that it was distinctly to the advantage of the author to preserve the renewal period. It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right.

"The present term of twenty-eight years, with the right of renewal for fourteen years, in many cases is insufficient. The terms, taken together, ought to be long enough to give the author the exclusive right to his work for such a period that there would be no probability of its being taken away from him in his old age, when, perhaps, he needs it the most. A very small percentage of the copyrights are ever renewed. All use of them ceases in most cases long before the expiration of twenty-eight years. In the comparatively few cases where the work survives the original term the author ought to be given an adequate renewal term. In the exceptional case of a brilliant work of literature, art, or musical com-

position it continues to have a value for a long period, but this value is dependent upon the merit of the composition. Just in proportion as the composition is meritorious and deserving will it continue to be profitable, provided the copyright is extended so long; and it is believed that in all such cases where the merit is very high this term is certainly not too long."

The Senate adopted the House report. Sen.Rep.No.1108, 60th Cong., 2d Sess. (1909).

Commenting upon the amendment of the renewal provision in the Copyright Act of 1909, it has been said that "This change, however, was not intended to make the two terms of copyright a continuous estate subject to the ordinary rules governing the devolution of property", Comment, 33 N.Y.U.L.Rev. 1027, 1029 (1958), but "On the contrary, the preservation of the discontinuity between the original and renewal terms as a protection to the author and his family against his own poor bargains was given such weight by Congress when it was preparing the act of 1909, that a single (and longer) term of life plus fifty years was rejected in favor of two terms of twenty-eight years. Id. at 1029 n. 20.

See The Supreme Court, 1959 Term, 74 Harv.L.Rev. 81, 115–116 (1960); Nimmer, Copyright 461 (1965); U. S. Copyright Law Revision Study No. 31, 121–122 (1960).

See Tobani v. Carl Fischer, Inc., 263 App. Div. 503, 507, 33 N.Y.S.2d 294, 299 (2nd Dept.1942), aff'd, 289 N.Y. 727, 46 N.E. 2d 347 (1942).[6a]

6a. Appellants' reliance upon the cases of Venus Music Corporation v. Mills Music, Inc., 261 F.2d 577 (2 Cir. 1958), and Rohauer v. Friedman, 306 F.2d 933 (9 Cir. 1962), in support of their claim that Youmans assigned renewal rights without mentioning them in its September 10, 1931 assignment to Miller, is misplaced.

Judge Kaufman's opinion in Venus is a perceptive, articulate confirmation of the views expressed in this dissent, for there the authors' original 1926 assignment of the copyright in the song to Watterson, without mentioning renewal rights, was assumed *not* to have transferred them; the subsequent 1931 assignment by Watterson of its rights acquired in 1926 from the authors to defendant, expressly including renewal rights, was found *not* to have transferred renewal rights because Watterson was unable to convey them; the 1936 bill of sale from the composer, Lyman, to defendant of all his "right, title and interest" in the song was held, "under these circumstances", to convey his renewal rights, although not expressly mentioned, since defendant (unlike Miller in the instant case on September 10, 1931) already owned the basic copyright which the composers had conveyed to Watterson in 1926 and Watterson had conveyed to defendant in 1931, hence "the 1936 assignment could not possibly have been intended to convey the original copyright which had already been assigned"—thus distinguishing the case from Rossiter v. Vogel, supra, and Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Co., 255 F.2d 518 (2 Cir. 1958), cert. denied, 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69 (1958), in both of which cases "the assignor still held his original copyright as well as his renewal right at the time of making the conveyance in question." Venus Music Corporation v. Mills Music, Inc., supra at 579. This Court in Venus noted that in Rossiter we sustained, as a transfer of renewal rights, the 1926 assignment of "all rights, title and interest in the song and all copyright renewals thereof" as against the 1910 general words of assignment of "all right, title and interests" with no mention of renewal rights; and that in Marks we sustained, as a transfer of renewal rights, the 1933 assignment which "clearly provided for the assignment of the renewal copyrights" as against the 1916 "general transfer to defendant's predecessor which makes no mention of renewal rights". Venus Music Corporation v. Mills Music, Inc., supra at 578–579.

In Rohauer, the Ninth Circuit, in affirming a judgment for plaintiff to recover damages for copyright infringement of a motion picture and to enjoin future infringement, cf. T. B. Harms Company v. Eliscu, 339 F.2d 823, 828 (2 Cir. 1964), was called upon to construe documents covering the 36 year period from 1924 to 1960 relating to the purported assignment of the copyright to "The Navigator"; in doing so, it noted that "There are no issues of fact to be litigated * * * and the only issues to be litigated are matters of law." In holding that the evidence supported the district court's conclusion that a 1937 assignment from Metro-Goldwyn Pictures Corp. to Loew's Inc. did effectively pass title to renewal rights, although the latter were not expressly mentioned in the general words of assignment, the court based its decision on the facts (i) that "shortly after this transfer Metro-Goldwyn Pictures Corp. was dissolved and went out of existence [which] course of action is, we think, inconsistent with an intention to retain the right to renew the copyright of 'The Navigator', a right not exercisable until fifteen years after the 1937 assignment", and (ii) that none of the parties before the court were the original authors or their heirs for whom the special statutory protection of Section 23 of the Copyright Act was intended, as construed by the Rossiter and Marks decisions of this Court. In this connection, the Ninth Circuit stated (306 F.2d 933, 935–936):

"Defendant argues that unless the conveying instrument expressly states that the renewal rights have been conveyed, the courts will find that the parties did not intend to transfer them. *This rule, however, reflects a policy of statutory copyright law which is not applicable to the facts of the case before us. By requiring the express mention of renewal rights in such transfers, thus avoiding an inadvertent or unintended transfer of such rights, the courts have found a means of carrying out the statutory policy of protecting the copyright interests of original authors and certain of their heirs.* See 17 U.S.C. § 24; Edward B. Marks Music Corp. v. Charles K. Harris Music Pub. Co., 255 F.2d

Giving effect to all terms of the agreements before us for construction in the instant case, and giving due recognition to the deeply rooted principle that an author or composer is not to be divested of a renewal copyright interest except upon a showing of the clearest language in the agreements, I think it is crystal clear upon the record before us that when the renewal term began November 1, 1958 neither appellant had acquired Gordon's renewal copyright interest in the composition since there was no valid and subsisting assignment of his renewal rights to either appellant. Accordingly, the renewal interest belonged to Gordon as the lyric writer until his death and 50% of his renewal interest belongs today to his son as assignee under his will. In short, since it is my view "as matter of law that the contract is unambiguous, evidence of the intention and acts of the parties plays no part in the decision of the case. Plain and unambiguous words, undisputed facts, leave no question of construction except for the court. The conduct of the parties may fix a meaning to words of doubtful import. It may not change the terms of a contract." Brainard v. New York C. R. R. Co., 242 N.Y. 125, 133, 151 N.E. 152, 154, 45 A.L.R. 751 (1926); Hartigan v. Casualty Co. of America, 227 N.Y. 175, 124 N.E. 789 (1919).

In the view that I take of the case, the contemporaneous documents, read together, determine the result, certainly without resort to parol evidence and with very little necessity for leaning upon inferences. To the extent that inferences may be drawn from the underlying documents, however, I must respectfully disagree with the majority that United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), requires us to draw inferences against the appellee in construing an alleged assignment transferring his renewal copyright interests. The Supreme Court in its per curiam opinion in Diebold reversed a summary judgment against the government in a civil antitrust action in which there was a "head-on factual controversy" revealed in the affidavits, attached exhibits and depositions, holding that where the head-on factual controversy presented a choice of inferences to be drawn from such subsidiary facts, such inferences must be viewed in the light most favorable to the party opposing the motion. In the instant declaratory judgment action, there was no head-on factual controversy presented by the contemporaneous documents the courts were called upon to construe. Construction of a contract, or contracts, as a matter of law is quite a different function from that involved in Diebold. Furthermore, the decision in Diebold can hardly be read to overturn the firmly established rule of judicial construction, outlined above, that an author or composer is not to be divested of his renewal copyright interest except upon a showing of the clearest language. Indeed, every reasonable inference should be drawn in his favor.

Finally, in my opinion the record in the instant case is a most inappropriate one on the basis of which to depart from our salutary rule uniformly adhered to in recent years that "mere formal denials and allegations, while sufficient to stand as pleadings, [are] to be pierced upon Rule 56 motions and [cannot] forestall the award of summary relief." Dressler v. MV Sandpiper, 331 F.2d 130, 132 (2 Cir.1964) and authorities cited at 132; Wilson Jones Co. v. Gilbert & Bennett Mfg. Co., 332 F.2d 216, 218–219 (2 Cir. 1964); Engl v. Aetna Life Ins. Co., 139 F.2d 469 (2 Cir.1943) and cases cited at 473; 6 Moore's Federal Practice ¶ 56.15 [2] and [3], at 2331–2349 (2d ed. 1965); compare Arnstein v. Porter, 154 F.2d 464 (2 Cir.1946), critically noted in Scope of Summary Judgment Under Federal Rules of Civil Procedure, 55 Yale L.J. 810 (1946).

518 (2nd Cir. 1958); and Rossiter v. Vogel, 134 F.2d 908 (2nd Cir. 1943). *That policy and rule clearly have no application here, since none of the* parties before the court are within the class of persons given special statutory consideration." (Emphasis added.)

Here, among other conclusory allegations which appellants pressed upon the district court in their attempt to defeat appellee's motion for summary judgment, were the following:

(1) Each of their answers alleged that "under date of December 18, 1930, Vincent Youmans, Inc. entered into an agreement with Mack Gordon, which cancelled a prior agreement dated August 12, 1930". This claim again was pressed upon the court in an affidavit by appellants' counsel of November 4, 1964, stating that "the agreement dated December 18, 1930 is the only agreement with respect to said composition between Mack Gordon and defendants, other than the cancelled agreement of August 12, 1930." But when appellants and their counsel finally got around to producing the December 18, 1930 agreement from their files, it turned out *never to have been signed by Gordon* and therefore was no agreement at all.

(2) Appellants' counsel then took the tack in their Rule 9(g) statement filed with the district court and in their brief in this Court that "the said agreement of August 12, 1930, at all times, remained and continued in full force and effect between defendant Vincent Youmans, Inc. and said Mack Gordon and thereafter between defendant Miller Music Corporation, as the successor in interest of defendant Vincent Youmans, Inc., and said Mack Gordon." The fact is, as counsel must very well know, that the August 12, 1930 agreement by its terms expired 18 months after its date of execution.

(3) Each of their answers alleged as a "Second Defense" that after execution of the December 18, 1930 agreement (which proved to be no agreement at all) Gordon gave Youmans a general release of all royalty claims *"under said agreement of December 18, 1930"* with respect to the "original and all renewal terms of copyright in said musical composition entitled 'Time On My Hands (You In My Arms)'". The only "evidence" appellants came forward with to substantiate this allegation in their pleadings, in opposing the motion for summary judgment, was (i) the conclusory, hearsay statement in the affidavit of appellants' counsel that "It was represented to me at the time [when the stock of Miller was acquired by Robbins Music Corporation in 1937] that there was no obligation to make any royalty payments to Mack Gordon with respect to said composition either during the original or renewal terms of copyright thereof. This was confirmed by *some documentation* signed by Mack Gordon, which I was informed had been executed in settlement of litigation in which Mack Gordon and defendant Vincent Youmans, Inc. were parties" (emphasis added) and (ii) the equally evasive affidavit of Miller's controller that as a result of a "thorough examination of the records and files of said defendant * * * I found *correspondence* in the files of said defendant, referring to said document [the alleged release from Gordon to Youmans]" (emphasis added). Even assuming the relevance of a release of royalty claims under a non-existent agreement, such affidavits referring to "some documentation" and "correspondence"—*which was never produced*—were wholly insufficient to raise a triable issue of fact under appellants' "Second Defense" in their answers and, under our decisions, should not forestall the award of summary relief. Supra note 3.

(4) Each appellant alleged in its answer the September 10, 1931 assignment by Youmans of "an interest in the American and Canadian copyrights in said musical composition" to Miller which has since published and exploited said musical composition. Appellants being the sole parties to this assignment, they presumably had possession of the originals and conformed copies. Appellee, not being a party thereto, would not be expected to have possession of either an original or a copy.. The September 10, 1931 assignment was never produced by appellants on this motion for summary judgment; neither an original nor a conformed copy is in the record before us. Only after post-argument requests to counsel through the Clerk of this Court

was a conformed copy of the assignment produced by appellants' counsel (and an abbreviated "formal" version thereof was produced by appellee's counsel [7]). The assignment, once produced, disclosed for the first time, to us, that Youmans had assigned one-half of *its* interest in the composition to Miller and did not even purport to assign *any renewal copyright interests whatsoever* to Miller—facts of singular significance with relation to the critical issue before us.

These are but four examples of numerous sham issues pressed upon the district court and this Court by appellants, either through formal pleadings or through vague, conclusory and misleading affidavits. Such allegations, in my opinion, are utterly insufficient in their failure to "set forth specific facts showing that there is a genuine issue for trial", within the meaning of the 1963 amendment to Rule 56(e).[8] Here, as in a recent case before this Court, "We are squarely faced, therefore, with significant questions as to the proper role of the District Court in motions for summary relief", Dressler v. MV Sandpiper, supra at 132, and it can be said with equal force here as in Dressler that "if [these appellants] were permitted to avoid summary judgment, [Rule 56] and its at-tempt to screen out sham issues of fact would become devoid of practical significance, and would stand as but a meaningless monument to noble, if ineffectual, intentions. Litigants would be enabled to postpone the inevitable to another day—precisely what summary judgment was intended to avoid." Id. at 133.

The instant case presents an even stronger situation for application of this principle; for here, after all the fumbling around with sham issues and legally insufficient affidavits, there has emerged "no genuine issue as to any material fact" so far as the existence of the contemporaneous documents is concerned. What has emerged is a pure question of law as to the construction of those documents. While there are differences between the majority and this dissent as to the construction to be placed on the documents, it remains a question of law, not an issue of fact.[9]

Appellee having established, primarily through the contemporaneous documents before us, Gordon's renewal copyright interest in the composition when the renewal term began November 1, 1958, and appellants having failed to establish any valid and subsisting assignment from Gordon to either appellant, I think appellee is entitled to summary judgment as a

---

7. Supra note 4.

8. Rule 56(e), as amended January 21, 1963, effective July 1, 1963:

"(e) *Form of Affidavits; Further Testimony; Defense Required.* Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. *When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as oth-erwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.*" (Emphasis added.)

9. "It may be, after all, that the matter is one in which the important thing, the law, is settled, and different people will account for it by such theory as pleases them best, as in the ancient controversy whether the finder of a thing which had been thrown away by the owner got a title in privity by gift, or a new title by abandonment. That he got a title no one denied. But although practical men generally prefer to leave their major premises inarticulate, yet even for practical purposes theory generally turns out the most important thing in the end." Holmes, The Theory Of Legal Interpretation, 12 Harv.L.Rev. 417, 420 (1899), reprinted in Holmes, Collected Legal Papers 209 (1952).

matter of law even without the presumption that an author is not to be divested of the fruits of his labor except upon a showing of the clearest language in the agreements; and with the benefit of that presumption, to which he is entitled under the mandate of Congress as consistently applied by the courts, including our own, in my opinion he has made out an *a fortiori* case not only for a declaratory judgment, but for summary judgment, in his favor.

Lest what I have said regarding the insufficiency of appellants' showing to defeat summary judgment be construed as an implication that the majority approves the practice of counsel disclosed by this record on a summary judgment motion, I hasten to emphasize that I do not understand such to be the majority's view. While I necessarily speak for myself in my position as lonesome end on this panel, to me the majority opinion clearly reflects dissatisfaction with the state of confusion thrown up by the summary judgment proceedings below. It is only in the matter of relief to be granted that we differ in our displeasure with what has emerged from counsel's handling of this summary judgment motion; the majority would remand to resolve the confusion; I would resolve it ourselves on the contemporaneous documents before us.

### LACHES

The majority appropriately refrains from expressing an opinion on the matter of laches, as likewise does this dissent. The majority leaves that issue to be considered by the district court upon remand. I would also leave the issue to the district court, but for a different reason: to be considered in connection with the claim of equitable relief for an accounting of royalties during the renewal term as well as during that portion of the original term not barred by the statute of limitations, appellee having established his legal interest in the renewal term of the copyright.

Upon the issue of laches, the district court may wish to consider, among other things, the fact that royalty statements were never rendered and royalties were never paid to Gordon (although provided for in all the pertinent agreements); that "the right of renewal is separate from the original copyright" and hence "the circumstances justifying the transfer of the right of renewal must be stronger than those justifying the transfer of the copyright", Rossiter v. Vogel, 134 F.2d 908, 911 (2 Cir.1943); Shapiro, Bernstein & Co. v. Bryan, 123 F.2d 697, 700 (2 Cir.1941); that "[b]y providing for two copyright terms, each of relatively short duration, Congress enabled the author to sell his 'copyright' without losing his renewal interest", Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 653-654, 63 S.Ct. 773, 87 L.Ed. 1055 (1943); Section 23 of the Copyright Act, 17 U.S.C. § 24; that, although appellee's interest in the renewal copyright is derived by assignment under his father's will from his father's renewal rights, the distribution of such rights to appellee occurred February 15, 1963 and the instant action was commenced August 5, 1963; that the renewal term did not begin until November 1, 1958 and Gordon died less than 4 months later, or 15 months after the earliest date upon which the renewal claim could be filed, Section 23 of the Copyright Act, 17 U.S. C. § 24; that in an action for a declaratory judgment with respect to the ownership of a renewal copyright interest, in dealing with a claim for accounting first asserted *after* the legal interest in the renewal rights had been established and construing the Declaratory Judgments Act, 28 U.S.C. § 2202, we held that "Each case where laches is urged as a defense must be decided on its own facts", Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Co., 255 F.2d 518, 523 (2 Cir.1958), cert. denied, 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69 (1958); and even if it should be found that appellee or his father did "sleep on his rights", the critical inquiry should be whether "his somnolence [should] count against him, [if] he evidenced marked diligence from the moment when

he could reasonably have been expected to awake", cf. United States v. Morgan, 222 F.2d 673, 675 (2 Cir.1955).[10]

SUMMARY

To summarize, I would affirm the declaratory judgment of the district court and let the parties get on with their accounting for royalties. By doing so, we would

(1) Leave the parties to the bargain they struck for themselves and not rewrite their contracts for them. The end result of their own contracts, read together as contemporaneous documents, establishes their respective interests as follows:

(a) Miller has one-half of Youmans' one-third interest in the copyright, pursuant to the assignment of September 10, 1931.

(b) Youmans has the remainder of that one-third interest, derived from Vincent Youmans as the composer of the music.

(c) Appellee, as assignee under his father's will, has one-half of Gordon's one-third interest in the renewal copyright, since there is no valid and subsisting assignment from Gordon to either appellant of Gordon's renewal rights.

(i) The August 12, 1930 executory assignment, long since expired, was ineffective in its purported assignment of renewal rights, since a promise to pay royalties did not constitute a valuable consideration for an executory assignment of an expectancy in renewal rights.

(ii) Even if Youmans had acquired Gordon's renewal rights under the August 12 assignment, they were released and returned to Gordon by the March 11, 1931 general release.

(iii) Corroboration that Youmans either never acquired Gordon's renewal rights or that, if acquired, they were returned by the March 11 general release, is found in the conspicuous absence of any assignment, or purported assignment, of renewal rights in Youmans' September 10, 1931 assignment to Miller.

(2) Give effect to the mandate of Congress, which consistently has been applied by the courts, including our own, recognizing that the right of renewal is separate from the original copyright and that circumstances justifying the transfer of the right of renewal must be stronger than those justifying the transfer of the copyright.

(3) Preserve unimpaired the salutary rule uniformly adhered to by our Court, and certainly since the 1963 amendments to Rule 56, that mere formal allegations in pleadings and affidavits will be pierced upon a summary judgment motion so that they cannot forestall an award of summary relief, particularly where, as here, the moving party is entitled to the presumption that an author is not to be divested of the fruits of his labor except upon a showing of the clearest language in the agreements.

(4) Leave to the district court the issue of laches to be considered in connection with the claim of equitable relief for an accounting of royalties.

For these reasons I would affirm.

---

10. The chancellors of old would turn over in their graves, emerge from their long somnolence and dance a jig to the tune of our musical composition if they were to be told that the lyricist who has enthralled the civilized world with "Time On My Hands, You In My Arms" was being charged with "sleeping on his rights", especially in view of the second half of the title. No chancellor would be that naive.