BARCLAYS BANK OF NEW YORK, Plaintiff,

v.

Gordon GOLDMAN and Ruhama Goldman, Defendants and Third-Party Plaintiffs,

v.

DANKNER DIAMONDS (ISRAEL) LTD., Moshe Dankner and Yoram Dankner, Third-Party Defendants.

80 Civ. 2546 (JMC).

United States District Court, S. D. New York.

June 22, 1981.

Hawkins, Delafield & Wood, New York City (W. Cullen MacDonald and David B. Newman, New York City, of counsel), for plaintiff.

Szold & Brandwen, P. C., New York City (Alan G. Blumberg, New York City, of counsel), for defendants and third-party plaintiffs.

Marchi, Jaffe, Cohen, Crystal, Rosner & Katz, New York City (Ernest Allen Cohen, New York City, of counsel), for third-party defendants.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Plaintiff's motion for summary judgment is granted. Fed.R.Civ.P. 56.

The third-party defendants' motion (1) to dismiss the complaint for lack of subject matter jurisdiction is denied, Fed.R.Civ.P. 12(b)(1), and (2) to dismiss the third-party complaint for insufficiency of service of process, failure to state a claim upon which

relief can be granted, and failure to plead the circumstances constituting fraud with particularity, is granted in part and denied in part. Fed.R.Civ.P. 9(b), 12(b)(5), 12(b)(6).

The third-party plaintiffs are granted leave to file an amended third-party complaint and to serve process on third-party defendant Dankner Diamonds (Israel) Ltd. within thirty days of the date of this Memorandum and Order.

## FACTS

Plaintiff Barclays Bank of New York ["Barclays" or "Bank"] brings this diversity action against defendants Gordon Goldman and Ruhama Goldman [the "Goldmans"][1] as guarantors of debts incurred by third-party defendant Dankner Diamonds (Israel) Ltd. ["DDIL"], a diamond importer and dealer. The Goldmans have counterclaimed for the return of certain payments they say they were not obligated to make, and have also commenced a third-party action for indemnity against DDIL, a corporation organized in Israel with its principal place of business in New York, Moshe Dankner, a citizen and resident of Israel, and Yoram Dankner, a resident of New York. Moshe is Yoram and Ruhama's father and Gordon is Ruhama's husband.

On September 15, 1975, the Goldmans, who were at the time officers of DDIL, signed, as guarantors, a document entitled "Guarantee and Security Agreement" [the "guarantee agreement"].[2] In pertinent part, the guarantee agreement provides that the guarantors (1) "absolutely and unconditionally [guarantee] to [the] Bank the prompt payment of claims of every nature and description of [the] Bank against [DDIL] ... and any and every obligation and liability of [DDIL] to [the] Bank ... of whatsoever nature and howsoever evidenced, whether now existing or hereafter incurred ... ([a]ll of the foregoing are hereinafter referred to as 'Obligations')," (2) "[consent] that [these] Obligations or the liability of any other guarantor, surety, indemnitor, indorser, or any other party for

or upon [DDIL's] Obligations ... may, from time to time in whole or in part, be renewed, extended, modified, accelerated, compromised, settled or released by [the] Bank ... without in any way [a]ffecting or releasing the liability of [the guarantors] hereunder," and (3) waive demand for payment from DDIL. The agreement further provides that the guarantors will pay an attorney's fee of fifteen percent of the principal and interest due if an attorney is used to enforce its terms.

At about the same time the guarantee agreement was signed, the Bank renewed a line of credit it had previously extended to DDIL. On September 30, 1975, P. G. Elkins, Barclays's vice president and manager, wrote to DDIL, to the attention of Gordon Goldman, as follows:

We are pleased to advise you that your Company's line of credit in our books has been renewed for a further year at the increased level of $75,000—.

The above line of credit is granted subject to the following terms and conditions:

1) The line to run for a period of one year to expire September 24, 1976 prior to which time it will be renewed.

2) Interest to be charged at the rate of 2% over the Bank's prime rate, payable quarterly in arrears.

3) The line to be secured by a pledge over inventory and accounts receivable with a U.C.C. filing.

4) The line to be guaranteed by Mr. & Mrs. G. Goldman.

5) Compensating balances of 15% of the line to be maintained.

6) The Bank to be provided with a "comfort" letter from the parent, M. Dankner & Sons Ltd. stating that should Dankner Diamonds (Israel) Ltd. have financial difficulties and not be able to meet its liabilities, M. Dankner & Sons Ltd. will ensure that the Bank will be repaid.

---

1. The Bank is a New York corporation and the Goldmans are citizens of Louisiana.

2. Notice of Motion, Exhibit 6 (filed July 9, 1980) ["Plaintiff's Motion"].

Should the above terms and conditions meet with your approval, please sign and return the attached copy of this letter signifying your agreement.[3]

On October 2, 1975, K. R. Pugsley, another Barclays vice president, wrote to DDIL to amend the September 30 letter, again to the attention of Gordon Goldman:

Further to our letter of September 30, 1975, in which we outlined the terms and conditions of the facility we have agreed to provide your company, we make the following amendment:

Borrowings are limited to 75% of the total amount of promissory notes held in our possession up to a maximum borrowing of $75,000—.

All other terms and conditions remain unchanged. Please sign and return the attached copy of this letter signifying your agreement.[4]

Gordon countersigned and returned a copy of each letter to indicate DDIL's agreement therewith.

On five occasions between September 19, 1975 and May 6, 1977, Barclays loaned money to DDIL, totalling $105,000, secured by DDIL's inventory and promissory notes given to DDIL by its customers. On each occasion, Gordon executed a demand note on DDIL's behalf. In addition, Ruhama signed the first demand note, dated September 19, 1975, and Yoram signed the fifth demand note, dated May 6, 1977, both acting on DDIL's behalf.[5] The demand notes are identical; each provides that Barclays may (1) sell all or part of the collateral "whenever in its discretion [it] considers such sale necessary for its protection," and (2) apply the proceeds from such disposition of the collateral "to the payment, in whole or in part, in such order as [the] Bank may elect, of one or more of [the] [o]bligations, whether due or not due, absolute or contingent."[6] Each note defines "obligations" to include "any and all liabilities and obligations of [DDIL] to [the] Bank and claims of every nature and description of [the] Bank against [DDIL] (including this note and any renewals, extensions or modifications thereof), whether now existing or hereafter incurred . . . ." Each loan carried an interest rate of two percent above the prime rate.

In July 1977, apparently without the Goldmans' knowledge, DDIL issued several checks in the total amount of $82,841.27, which the Bank honored and paid despite the fact that at the time no funds remained in DDIL's checking account with the Bank. Barclays then liquidated the collateral it held to secure the DDIL loans, receiving approximately $120,000 in proceeds. The Bank applied these proceeds first to cover the overdrafts and used the remainder to reduce the loan balance to $63,500. To date, this amount, plus interest, has not been paid either by DDIL or the Goldmans, despite the Bank's due demand on each. On May 6, 1980, the Bank commenced this action to enforce the guarantee agreement.

The Goldmans commenced a third-party action against Moshe and Yoram Dankner and DDIL on July 21, 1980. By order, the Court (Sweet, J.) authorized service on DDIL and Moshe in Israel by an individual authorized to serve process there.[7] On August 20, 1980, the Goldmans filed an affidavit of an Israeli attorney which states that he had effected personal service on Moshe individually and as an officer and control-

---

3. Plaintiff's Motion, Exhibit 7.

4. Affidavit of Gordon Goldman, Exhibit B (filed July 31, 1980).

5. Plaintiff's Motion, Exhibits 1–5.

6. The Bank mistakenly states that the guarantee agreement contains language giving the Bank identical rights with respect to the disposition of collateral pledged by the borrower to secure its obligations, namely, the loans to DDIL. In fact, however, the guarantee agreement's use of the term "Collateral Security" refers in every instance to collateral, if any, deposited or pledged by the *guarantor* to secure the *guarantor's* liabilities under the guarantee agreement. The Goldmans did not provide the Bank with any such collateral. *See* Plaintiff's Motion, Exhibit 6, unnumbered paragraphs 2, 4, 5, and 8.

7. Order Appointing Persons to Serve Third-Party Process (filed July 21, 1980).

ling shareholder of DDIL.[8] According to both Moshe's common-law wife and his maid, however, the Dankners were not at home when the process server arrived and service was made only upon the maid, who was neither connected with DDIL in any way nor authorized by Moshe or DDIL as an agent to accept service on their behalf.[9] Yoram's attorneys agreed to accept service of process on his behalf.[10]

In their third-party complaint, the Goldmans allege that they signed the guarantee agreement only on Moshe's personal assurance that all of DDIL's debts would be paid and on his oral promise that he would indemnify them against all claims asserted by Barclays. The Goldmans claim that Moshe has breached these promises and that the promises were fraudulent. The Goldmans also allege that Moshe orally promised Gordon that DDIL or Moshe would reimburse Gordon for any of DDIL's debts to other creditors that Gordon paid out of his personal funds. They claim that they expended $400,000 to this end and that Moshe has refused to reimburse them. They also claim that this promise too was false and fraudulent. Finally, the Goldmans allege that (1) Moshe and Yoram caused checks to be drawn on DDIL's checking account, made payable to companies controlled by Moshe, knowing that there were no funds to cover the checks, (2) they caused the payees improperly to accept the proceeds of the checks, and (3) they otherwise caused DDIL's assets to be transferred without fair consideration.

Barclays has moved for summary judgment. DDIL, Moshe and Yoram have moved (1) to dismiss the complaint for lack of subject matter jurisdiction, (2) to dismiss the third-party complaint against DDIL and Moshe for insufficiency of service of process,[11] and (3) to dismiss the second, third, fourth and fifth causes of action in the third-party complaint for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity.

## DISCUSSION

*Barclays's Motion for Summary Judgment*

The Goldmans acknowledge that they signed the guarantee agreement in September 1975 and do not dispute the Bank's claim that the five loans made to DDIL between September 19, 1975 and May 6, 1977 remain substantially unpaid. The Bank's argument is simply that based on these admitted facts it is entitled to judgment pursuant to the Goldmans' unconditional guarantee of the five loans. *See Chase Manhattan Bank N.A. v. Marcovitz,* 56 A.D.2d 763, 392 N.Y.S.2d 435 (1st Dep't 1977); *Rhodia, Inc. v. Steel,* 32 A.D.2d 753, 300 N.Y.S.2d 1005 (1st Dep't 1969).

The Goldmans' argument, not surprisingly, is more complex, although essentially they claim that genuine issues of material fact exist as to whether the Bank complied with the terms and conditions of the guarantee agreement. *See Andes Co-operative Dairy Co. v. Commercial Casualty Ins. Co.,* 207 A.D. 102, 201 N.Y.S. 664 (3d Dep't 1923), *aff'd mem.,* 237 N.Y. 622, 143 N.E. 767 (1924). The Goldmans contend that the guarantee agreement and the letters of September 30 and October 2, 1975 should be read together and thus deemed to constitute a single contract. They argue further that because the typewritten letters were specifically prepared for the transactions at issue, the terms therein take precedence over all terms to the contrary in a printed general form such as the guarantee agreement. The Goldmans then reason that the letters placed certain restrictions on the

---

8. Affidavit of Itzhak Segal, ¶ 2 (filed Aug. 20, 1980).

9. Notice of Motion to Dismiss the Complaint and the Thirty-Party [sic] Complaint, Affidavits of Ilana Dankner and Helen B. Subido (filed Dec. 15, 1980).

10. Stipulation and Order (filed Oct. 22, 1980).

11. Although cast in terms of a motion to dismiss for lack of personal jurisdiction, Fed.R.Civ.P. 12(b)(2), this portion of the third-party defendants' motion actually challenges only the sufficiency of service of process, and the Court is therefore treating it as a motion to dismiss under Fed.R.Civ.P. 12(b)(5).

broad terms of the printed guarantee agreement, namely that (1) the Goldmans' guarantee would be limited to a one-year $75,000 line of credit extended to DDIL, (2) the Bank was not authorized to dispose of the collateral except solely to reduce DDIL's indebtedness on that line of credit, and (3) the guarantee was conditioned upon the Bank's securing an additional guarantee from DDIL's parent corporation, M. Dankner & Sons Ltd.

Whether the letters and the guarantee agreement should be read together clearly turns on the intention of the parties. *See Dynamics Corp. of America v. International Harvester Co.*, 429 F.Supp. 341 (S.D.N.Y. 1977). Normally, this would be a question of fact, *see Lowell v. Twin Disc, Inc.*, 527 F.2d 767 (2d Cir. 1975), but since the Court should " 'draw all reasonable inferences in favor of the party against whom summary judgment is sought,' " *Gladstone v. Fireman's Fund Insurance Co.*, 536 F.2d 1403, 1406 (2d Cir. 1976) (quoting *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)); *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 262 (2d Cir. 1965), the Court will assume for the purposes of this motion that the parties intended the letters and the printed guarantee agreement to constitute a single contract.[12] Despite adopting this portion of the Goldmans' theory of the case, the Court is still compelled to grant summary judgment in favor of the Bank.

 The Court agrees with the Goldmans that the terms of the letters would control the terms of the guarantee agreement provided they are inconsistent or contradictory. *See Poel v. Brunswick-Balke-Collender Co.*, 216 N.Y. 310, 110 N.E. 619 (1915); *Trade Bank & Trust Co. v. Goldberg*, 38 A.D.2d 405, 330 N.Y.S.2d 69 (1st Dep't 1972); *Laurino v. Hewman*, 10 A.D.2d 725, 199 N.Y.S.2d 279 (1st Dep't 1960). The

Court finds, however, that no inconsistency or contradiction exists between the terms of the various documents comprising the guarantee agreement. In the first place, the printed guarantee agreement form unambiguously and indisputably provides for the guarantee of DDIL's obligations and liabilities to the Bank whether then in existence or later incurred and includes any extensions or renewals thereof. The letters are not to the contrary. They simply provide for a one-year line of credit to DDIL in the amount of $75,000, but do not contain language that could be construed to limit the Goldmans' previously executed guarantee to debts arising under the line of credit during this time period or in this dollar amount.

 The Goldmans argue moreover that the letters limited the Bank's right to sell the collateral and apply the proceeds to satisfy any obligation of DDIL in any order that Barclays saw fit, and that, therefore, when the Bank applied the proceeds of the sale of the collateral to cover DDIL's checking account overdrafts, it breached the terms of the guarantee agreement. The letters do not, however, so limit the Bank's right to dispose of the collateral but rather indicate that the Bank's extension of a line of credit to DDIL was conditioned upon DDIL's securing the loans with inventory and accounts receivable. As between DDIL and the Bank, this condition was satisfied. The Court, moreover, finds the letters devoid of any language that could be construed to place an additional obligation on the Bank to apply the proceeds of that collateral solely to reduce DDIL's indebtedness on the line of credit as distinguished from any of DDIL's other obligations to the Bank.

On this latter point, the Bank relies heavily on its claim that in the guarantee agreement the Goldmans waived any rights they might otherwise have had with respect to

---

**12.** The Court does not agree with the Bank's technical assertion that the letters are addressed to DDIL and therefore cannot constitute any part of an agreement between the Goldmans and the Bank. Each letter's salutation refers to Gordon and each contains language that is consistent with interpreting the letters as part of the guarantee agreement between the Bank and the Goldmans. *See Gordon v. Vincent Youmans, Inc., supra*, 358 F.2d at 263. In effect, the letters form part of both the agreement between the Goldmans and the Bank and the agreement between DDIL and the Bank.

this collateral, such as the right of discharge by the release or impairment of the security. *See Chemical Bank v. Layne,* 423 F.Supp. 869 (S.D.N.Y. 1976); *Walter E. Heller & Co. v. Cox,* 343 F.Supp. 519 (S.D. N.Y. 1972), aff'd mem., 486 F.2d 1398 (2d Cir.), cert. denied, 414 U.S. 827, 94 S.Ct. 46, 38 L.Ed.2d 61 (1973); *Indianapolis Morris Plan Corp. v. Karlen,* 28 N.Y.2d 30, 319 N.Y.S.2d 831, 268 N.E.2d 632 (1971); *Mikanis Trading Corp. v. Block,* 59 A.D.2d 689, 398 N.Y.S.2d 679 (1st Dep't 1977); *Lafayette Bank & Trust Co. v. Silver,* 58 Misc.2d 891, 296 N.Y.S.2d 926 (App. Term, 2d Dep't 1969). The Court has carefully reviewed the printed guarantee agreement form and can find no such express waiver.[13] Of course, the demand notes, all of which were signed by Gordon Goldman in his representative capacity, expressly permit the Bank to dispose of the collateral in its discretion and apply the proceeds thereof to any obligation of DDIL in any order. As explained below, the Court believes that under the circumstances of this case the Goldmans are bound by the language of the demand notes. *See Burston v. Garret Building Corp.,* 252 N.Y. 230, 169 N.E. 287 (1929) (Cardozo, C.J.); *Marjax Enterprises v. Upstate Hiawatha Plaza Co.,* 62 A.D.2d 1159, 404 N.Y.S.2d 480 (4th Dep't 1978); *Standard Brands Inc. v. Straile,* 23 A.D.2d 363, 260 N.Y.S.2d 913 (1st Dep't 1965). *See also Chemical Bank v. Layne, supra,* 423 F.Supp. 869; *Walter E. Heller & Co. v. Cox, supra,* 343 F.Supp. 519; *Catskill National Bank v. Dumary,* 206 N.Y. 550, 100 N.E. 422 (1912); *Lafayette Bank & Trust Co. v. Silver, supra,* 58 Misc.2d 891, 296 N.Y.S.2d 926.

In *Burston,* the New York Court of Appeals held that where the principal of the debtor corporation guarantees the corporation's indebtedness, and the circumstances show that the guarantor is fully aware of the terms of the principal obligation, the guarantor's liability on the guarantee is measured by that of the debtor corporation even though the pertinent provision of the principal obligation, namely, an acceleration clause, is not incorporated or referred to in

the instrument of guarantee. 252 N.Y. at 234–35, 169 N.E. 287. In *Standard Brands,* the debtor corporation's president executed both the loan agreement, in his representative capacity, and the guarantee agreement, in his individual capacity, as part of the same transaction, and the circumstances indicated that the guarantor was aware that the creditor had released the debtor in the loan agreement. Normally, such a release would discharge the guarantor. The Court found, however, that the guarantor was deemed to have assented to whatever was contemplated in the loan agreement, 23 A.D.2d at 367, 260 N.Y.S.2d at 917–18, and therefore held that he was not entitled to the defense of release of the debtor. Finally, in *Marjax,* where the guarantors were apparently the principals of the debtor corporation, and the creditor and the corporation agreed to extend the time for payment, the guarantors argued that the extension was a modification of the principal agreement that operated to discharge the guarantors. *See Depositors Trust Co. v. Hudson General Corp.,* 485 F.Supp. 1355 (E.D.N.Y. 1980). The Court nevertheless held that since the modification had been proposed by the guarantors' attorney and one of the guarantors had executed his guarantee the same day that the extension was given, the guarantors were deemed to acquiesce in and consent to the modification. 62 A.D.2d at 1160, 404 N.Y.S.2d at 482.

The relevance of these decisions to the instant dispute is significant because the circumstances indicate that the Goldmans were fully aware of the terms of the demand notes—both husband and wife signed the first demand note and Gordon signed all the others over a period of nearly two years. Thus, the Goldmans can hardly complain that the Bank's extensive rights with respect to the collateral were unknown to them. The Court therefore finds that their liability under the guarantee agreement is measured by DDIL's liability under the demand notes. Thus, the guarantee agreement can be deemed to contain the same terms with respect to the Bank's ability to

---

**13.** *See* note 6 *supra.*

dispose of the collateral as are contained in the demand notes. In effect, the Court agrees with the Bank that the Goldmans waived whatever rights they may have had with respect to disposition of the collateral, although the Court has taken a more circuitous route to this conclusion than that taken by the Bank. There can be no dispute that such a waiver permits the creditor, such as Barclays, to release the collateral, without notice to the guarantor and without in any way affecting or discharging the guarantor's liability. *See Indianapolis Morris Plan Corp. v. Karlen, supra,* 28 N.Y.2d 30, 319 N.Y.S.2d 831, 268 N.E.2d 632; *Inland Credit Corp. v. Weiss,* 63 A.D.2d 640, 405 N.Y.S.2d 258 (1st Dep't 1978), *appeal dismissed,* 46 N.Y.2d 849, 414 N.Y.S.2d 315, 386 N.E.2d 1336 (1979); *accord, Walter E. Heller & Co. v. Cox, supra,* 343 F.Supp. 519; *Chemical Bank v. Prudent Holding Co. of America, Inc.,* 63 A.D.2d 666, 404 N.Y.S.2d 688 (2d Dep't 1978). And since there is no contrary or limiting language in the September 30 and October 2, 1975 letters, the terms of the demand notes control on the issue of the proper disposition of the collateral proceeds.

■ The Goldmans argue that the Bank also breached the guarantee agreement by failing to obtain a "comfort letter" from DDIL's parent corporation, M. Dankner & Sons Ltd. The September 30 letter from the Bank to DDIL states that the

line of credit is granted subject to the following terms and conditions:

. . . .

6) The Bank to be provided with a "comfort" letter from the parent, M. Dankner & Sons Ltd. stating that should [DDIL] have financial difficulties and not be able to meet its liabilities, M. Dankner & Sons Ltd. will ensure that the Bank will be repaid.[14]

The Goldmans contend that a "comfort letter" is a guarantee and that their own guarantee was given on the condition that DDIL's parent corporation also become a guarantor at the Bank's request. The parent never did provide the Bank with a guarantee or a "comfort letter" and the Goldmans claim that this was a breach of condition.

Even though the Court will deem typewritten terms to control inconsistent printed terms, it fails to see how this provision either contradicts anything in the printed guarantee form or makes the Goldmans' guarantee conditional on the Bank's obtaining anything in the nature of a guarantee from M. Dankner & Sons Ltd. Moreover, by its terms, the quoted paragraph is a matter of concern between the Bank and DDIL only. As noted previously, the fact that these letters are being considered together with the printed documents does not mean that everything in the letters relates to both the printed guarantee agreement and the demand notes. In this instance, the letter unambiguously refers to an arrangement between DDIL and the Bank, irrespective of the Goldmans as guarantors.

On each of these points—the claimed limitation of the guarantee as to time period, dollar amount of the loan and the Bank's rights with respect to disposition of the collateral, and the alleged condition of obtaining a comfort letter—the Court has found that no construction of the terms of the letters alters or contradicts the terms of the guarantee agreement and demand notes. Indeed, the sole manner in which the Goldmans could prove their contentions in these areas is through the introduction of parol evidence.

■ In New York, the parol evidence rule is that the clear and unambiguous terms of a valid written instrument purporting to express the entire agreement of the parties cannot be contradicted or varied by prior or contemporaneous extrinsic oral or written evidence. *See Leumi-Financial Corp. v. Richter,* 17 N.Y.2d 166, 269 N.Y. S.2d 409, 216 N.E.2d 579 (1966); *Oxford Commercial Corp. v. Landau,* 12 N.Y.2d 362, 239 N.Y.S.2d 865, 190 N.E.2d 230 (1963); *Zugarek v. Walck,* 54 A.D.2d 1074, 388 N.Y. S.2d 756 (4th Dep't 1976); *Jiffy Sew Corp. v. Paar,* 29 A.D.2d 643, 286 N.Y.S.2d 865

14. Plaintiff's Motion, Exhibit 7.

(1st Dep't 1968); *Marcus v. Fabrikant,* 34 Misc.2d 945, 229 N.Y.S.2d 304 (Sup.Ct. New York Co. 1962); *accord, Cortlandt v. E.F. Hutton, Inc.,* 491 F.Supp. 1 (S.D.N.Y. 1979); *Meinrath v. Singer Co.,* 482 F.Supp. 457 (S.D.N.Y. 1979); *Fischer v. C.J. Lawrence & Co.,* 481 F.Supp. 357 (S.D.N.Y. 1979). A contract within the rule may consist of more than one written document, as is the case herein at least for purposes of this motion. *See* 3 A. Corbin, *Contracts* § 573, at 359 n.3. The Court finds the terms of the writings to be clear and unambiguous, and there is no dispute as to the validity of the instruments. Moreover, the guarantee agreement certainly appears complete on its face, which indicates that it is the entire agreement of the parties, *see Battery Steamship Corp. v. Refineria Panama, S.A.,* 513 F.2d 735, 738 n.3 (2d Cir. 1975), and it is clear from the unambiguous terms of the documents themselves that the parties have manifested their assent to the writings as the final statement of their intentions.

To prove that their guarantee was limited to a single $75,000 line of credit, the Goldmans would need to introduce evidence of agreements or conversations between the parties prior to or contemporaneous with the execution of these documents to the effect that the parties intended such a limitation. This evidence would directly contradict the written terms of what the Court has found to be an integrated contract. Similarly, with respect to the alleged agreement to limit the Bank's right to apply the proceeds of the collateral and to obtain a "comfort letter" from DDIL's parent corporation, the Goldmans would need to rely on parol evidence to prove their contentions since the written contract does not support their interpretation. Again, such evidence would necessarily vary or contradict the written terms of the contract and is therefore inadmissible as a matter of law. In short, since any such agreements are deemed to be embodied in the written contract, the Goldmans must be held to what that contract says. Summary judgment in favor of the Bank is therefore appropriate.[15]

*Motion to Dismiss the Complaint*

■ The third-party defendants—DDIL and Moshe and Yoram Dankner—assert that the Bank's complaint against the Goldmans should be dismissed for lack of diversity of citizenship between DDIL and the Bank. Their motion is premised on the argument that DDIL should be deemed to be a defendant since it is the primary obligor on the notes guaranteed by the Goldmans. As noted previously, the Bank is a New York corporation and DDIL's principal place of business is New York.

Under Fed.R.Civ.P. 14(a), pursuant to which this third-party action was commenced, when there is diversity between plaintiff and defendant, the court has subject matter jurisdiction over the third-party claims even if the third-party defendant is of the same citizenship as the plaintiff. *See*

15. With respect to the Goldmans' counterclaim for conversion, the Bank simply relies on a provision in the guarantee agreement by which the guarantors purport to waive "the right to interpose any ... counterclaim of any nature or description." *See Bank of New York v. Cariello,* 69 A.D.2d 805, 415 N.Y.S.2d 65 (2d Dep't 1979). The Goldmans contend to the contrary that an agreement to waive a counterclaim is unenforceable in federal court with respect to a compulsory counterclaim. *See Loader Leasing Corp. v. Kearns,* 83 F.R.D. 202 (W.D. Pa. 1979). It is unnecessary for the Court to resolve this issue, however, since the Goldmans can only assert the counterclaim if they are found to be not liable under the guarantee. In light of the Court's disposition of the Bank's motion for summary judgment, the counterclaim is dismissed.

The Bank also claims it is entitled to attorneys' fees to the extent of fifteen percent of the principal and interest due on the loans, since the guarantee agreement so provides when an attorney is used to enforce collection. The Court declines to award attorneys' fees at this time, however, in light of the New York rule that the fee must be based on the reasonable value of the legal services rendered despite the percentage fixed in the guarantee agreement. *See National Bank of North America v. Arthur R. Smith Mechanical Corp.,* 74 A.D.2d 600, 424 N.Y.S.2d 512 (2d Dep't 1980); *Federal Deposit Ins. Corp. v. Park Lane Realty Assocs.,* 72 A.D.2d 788, 421 N.Y.S.2d 611 (2d Dep't 1979); *Bank of New York v. Clavier Corp.,* 29 A.D.2d 927, 289 N.Y.S.2d 125 (1st Dep't 1968). The Court will permit both parties to be heard on this issue at an appropriate time.

*Fawvor v. Texaco, Inc.*, 546 F.2d 636 (5th Cir. 1977); *Agrashell, Inc. v. Bernard Sirotta Co.*, 344 F.2d 583 (2d Cir. 1965); 3 Moore's *Federal Practice,* ¶ 14.26. The third-party defendants argue, nevertheless, that the Bank has attempted to circumvent the limited jurisdiction of the federal courts by not suing DDIL in the main action. *See Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) [*"Owen"*].

The Court concludes that the third-party defendants' argument is erroneous. Each of the demand notes provides that DDIL "waives protest, demand for payment, notice of default or nonpayment to [itself] or any other party liable for or upon any of" the loans made by the Bank to DDIL.[16] The guarantee agreement provides that the Goldmans waive "protest, demand for payment, notice of default or nonpayment to or on [the Goldmans], [DDIL] or any other party liable for or upon any of" the loans made by the Bank to DDIL.[17] Since no party has challenged the validity of these instruments, it is clear that it was not necessary that the Bank join DDIL as an original defendant.

The sole relevant case relied upon by the third-party defendants is not to the contrary. In *Owen*, plaintiff, a citizen of Iowa, sued defendant, a citizen of Nebraska, who in turn impleaded the third-party defendant, a citizen of Nebraska. Plaintiff then amended her complaint to sue the third-party defendant directly. At trial, it became clear that the third-party defendant's principal place of business was actually Iowa, making it a citizen of that state for jurisdictional purposes. The Supreme Court held that when a plaintiff asserts a claim directly against a third-party defendant, there must be diversity of citizenship between the plaintiff and the third-party defendant for the federal court to have subject matter jurisdiction over that claim. 437 U.S. at 373–77, 98 S.Ct. at 2402–2405. In the instant action, of course, the Bank has asserted no claim against any of the third-party defendants and thus diversity is not required.

*Motion to Dismiss the Third-Party Complaint*

The third-party defendants have moved to dismiss the complaint against Moshe and DDIL for insufficiency of service of process,[18] claiming that despite the affidavit of an Israeli process server to the contrary, service was effected only upon Helen Subido, a maid at Moshe's residence in Israel, and not upon Moshe individually or as DDIL's representative. Even assuming the truth of the affidavits of Moshe's common-law wife and maid, however, the Court must deny the motion with respect to Moshe and grant the motion without prejudice as to DDIL with leave to defendants to serve the papers again, provided they do so within thirty days of the date of this Memorandum and Order.[19]

■ *First,* Fed.R.Civ.P. 4(d)(1) provides that service upon an individual may be made "by leaving copies [of the summons and complaint] at his dwelling house or usual place of abode with some person of suitable age and discretion then residing therein." Based on the affidavits submitted, the Court finds that the maid was residing at the Dankner home and was clearly a "person of suitable age and discretion," since she was an adult, spoke English and evidently exercised sufficient discretion to deliver the papers successfully to Moshe.

■ *Second,* because the Goldmans concede that Helen Subido was neither an officer or managing or general agent of DDIL, nor an agent authorized to accept service on DDIL's behalf, the Court finds service upon DDIL to be insufficient. The Court further finds, however, that the corporation, through Moshe, is fully aware of the exist-

---

**16.** Plaintiff's Motion, Exhibits 1–5.

**17.** Plaintiff's Motion, Exhibit 6.

**18.** *See* notes 10–11 *supra* and accompanying text.

**19.** For this purpose, Judge Sweet's Order of July 21, 1980 remains applicable. *See* note 7 *supra.*

ence and nature of this litigation. Therefore, it would hardly be prejudicial to DDIL to permit the Goldmans to attempt service a second time in accordance with the prior order of this Court. If defendants are unable to effect service within thirty days of the date of this Memorandum and Order, the Court will order the third-party action against DDIL dismissed, unless it appears that DDIL attempted to avoid service of process.

*Motion to Dismiss the Second and Fourth Causes of Action in the Third-Party Complaint*

The third-party defendants advance essentially two grounds in support of their claim that the second and fourth causes of action of the third-party complaint should be dismissed. *First,* they claim that even if Moshe did promise the Goldmans that he would indemnify them against all claims asserted by the Bank, and that he or DDIL would reimburse Gordon for any of DDIL's other debts that Gordon paid out of his personal funds,[20] these promises were oral and thus unenforceable under the New York statute of frauds. N.Y.Gen. Oblig.Law § 5–701(a)(2) (McKinney Supp. 1980). *Second,* they argue that if the second and fourth causes of action are deemed to be claims for fraud rather than breach of contract, they must be dismissed for failure to plead fraud with particularity under Fed.R.Civ.P. 9(b).

■ Section 5–701 of the New York General Obligations Law provides, in pertinent part:

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

. . . .

2. Is a special promise to answer for the debt, default or miscarriage of another person . . . .

**20.** These allegations constitute the second and fourth causes of action respectively.

The third-party defendants argue that Moshe's alleged promises, in both cases, were promises to answer for the debts or default of DDIL, and hence within the statute of frauds. The third-party defendants rely on Judge Stewart's decision in *Halpern v. Rosenbloom,* 459 F.Supp. 1346 (S.D.N.Y. 1978), in which two of three guarantors of a corporation's indebtedness sued the third guarantor. The defendant counterclaimed against one plaintiff claiming *inter alia* that that plaintiff had orally agreed to indemnify him against any liability arising from his guarantee. The court held that such an agreement was within section 5–701(a)(2) and that the counterclaim was therefore barred. *Id.* at 1355.

With all due respect to Judge Stewart, the Court believes that this interpretation of New York law overlooks clear authority to the contrary from the state courts which is, of course, controlling in this diversity action. In *Jones v. Bacon,* 145 N.Y. 446, 449, 40 N.E. 216 (1895), the Court of Appeals held that the "promise by one person to indemnify another for becoming a guaranty for a third is not within the statute [of frauds] and need not be in writing."

The holding of *Jones v. Bacon* was reaffirmed in *Gilinsky v. Klionsky,* 140 Misc. 724, 251 N.Y.S. 570 (Sup.Ct. Broome Co. 1931), in which Bernet Klionsky orally agreed that if the plaintiffs guaranteed the notes of his brother Israel, Bernet would indemnify the plaintiffs against loss. The plaintiffs became guarantors on Israel's notes and when Israel defaulted they were required to pay Israel's creditors. In a scholarly opinion, the court held that defendant's promise was not within the statute of frauds, explaining:

The defendant's promise was not to pay the indebtedness of his brother Israel to the banks; his promise was to pay an indebtedness not then in existence, but which would come into existence if and when these plaintiffs as guarantors of the banks' indebtedness were required to pay and did pay that indebtedness.

*Id.* at 725–26, 251 N.Y.S. at 571–72. Quoting from an English opinion, the court stated that

"there is a plain distinction between a promise to pay the creditor if the principal debtor makes default in payment, and a promise to keep a person who has entered, or is about to enter, into a contract of liability indemnified against that liability, independently of the question whether a third person makes default or not."

*Id.* at 726, 251 N.Y.S. at 572 (quoting *Harburg India Rubber Comb Co. v. Martin,* [1902] 1 K.B. 778, 785). The rule was recently reiterated by Judge Munson in *In re Naramore,* 3 B.R. 709, 714 (Bkrcty. N.D. N.Y. 1980). *See* 2 A. Corbin, *Contracts* §§ 385–86.

The facts of the instant litigation place it squarely within the rule stated above. The Goldmans' promise to guarantee DDIL's indebtedness is within the statute of frauds, *see Vola v. C.P. Whitney Co.,* 105 N.Y.S.2d 58 (1st Dep't 1951); *Union Properties, Inc. v. Bogdanoff,* 250 A.D. 282, 294 N.Y.S. 151 (1st Dep't 1937), but Moshe's alleged promise to indemnify them for becoming guarantors is not. Thus, as to the second cause of action, the Court rejects the third-party defendants' argument grounded on the statute of frauds.

As to the fourth cause of action, Moshe's alleged promise to reimburse Gordon for the latter's paying the debts of the corporation is even more clearly not a "promise to answer for the debt, default or miscarriage of another." There is no allegation that Moshe promised DDIL's creditors that he would make good on DDIL's debts, which would be within section 5–701(a)(2). The only allegation is that Moshe agreed to reimburse Gordon to the extent that Gordon answered for the debts of DDIL. *See* 2 A. Corbin, *Contracts* § 349, at 220.

■ Besides alleging breach of contract, the second and fourth causes of action of the third-party complaint also allege fraud. Therefore, the circumstances constituting the alleged fraud must be pleaded with particularity. Fed.R.Civ.P. 9(b). The courts of this Circuit have clearly established a pleader's obligations under Rule 9(b). *See Ross v. A.H. Robins Co.,* 607 F.2d 545 (2d Cir. 1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Denny v. Barber,* 576 F.2d 465 (2d Cir. 1978); *Felton v. Walston & Co.,* 508 F.2d 577 (2d Cir. 1974); *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Segal v. Gordon,* 467 F.2d 602 (2d Cir. 1972); *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442 (2d Cir. 1971); *Sigety v. Buxton's Country Shops, Inc.,* 80 Civ. 2693 (S.D.N.Y. Oct. 3, 1980); *Todd v. Oppenheimer & Co.,* 78 F.R.D. 415 (S.D.N.Y. 1978); *Rich v. Touche Ross & Co.,* 68 F.R.D. 243 (S.D.N.Y. 1975). In essence, a plaintiff must specify:

1) precisely what statements were made in what documents or oral representations or what omissions were made, and 2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, 3) the content of such statements and the manner in which they misled the plaintiff, and 4) what the defendants "obtained as a consequence of the fraud."

*Todd v. Oppenheimer & Co., supra,* 78 F.R.D. at 420–21 (quoting *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1088 (S.D.N.Y. 1977), *aff'd mem.,* 636 F.2d 1201 (2d Cir. 1980)). Moreover, an allegation on "information and belief" is sufficient under Rule 9(b) only if it is "accompanied by a statement of the facts upon which the belief is founded." *Schlick v. Penn-Dixie Cement Corp., supra,* 507 F.2d at 379; *see Heller v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.,* [1976–1977] Fed.Sec. L.Rep. (CCH) ¶ 95,811, at 90,929–30 (S.D. N.Y. 1976).

■ The Court finds that the second and fourth causes of action fall just short of the stringent requirements of Rule 9(b). In the second cause of action, paragraph 16 states: "On information and belief, the said representation and promise of Moshe Dankner were false and fraudulent since Moshe

Dankner knew at the time he made the representation and promise that he had no intention of honoring them." [21] The Goldmans fail to allege the time and place of the allegedly fraudulent statements, and, in addition, do not accompany the allegation in paragraph 16 with a statement of the facts upon which they base their belief that Moshe knew he would not honor his promise. The fourth cause of action, read as a whole, is substantially more particularized but still fails to state facts upon which the Goldmans base their belief that Moshe knew he would not honor his promises to Gordon. The Court will, however, afford the Goldmans an opportunity to correct these deficiencies by filing an amended third-party complaint.

*Motion to Dismiss the Third and Fifth Causes of Action in the Third-Party Complaint*

The third and fifth causes of action charge Moshe and Yoram with improprieties regarding DDIL's checking account funds and other assets, in violation of article 10 of the New York Debtor and Creditor Law, N.Y. Debt. & Cred. Law §§ 270–281 (McKinney 1945), which proscribes fraudulent conveyances. Under Rule 9(b), such allegations require particularized pleading. The Court agrees with the third-party defendants that the Goldmans' allegations are, at this stage, conclusory. It is impossible to determine how they claim that article 10 was violated, which sections were violated, and how and why they are entitled to relief thereunder. *See Loblaw, Inc. v. Wylie,* 50 A.D.2d 4, 375 N.Y.S.2d 706 (4th Dep't 1975). The Court will, however, again afford the Goldmans an opportunity to correct these deficiencies in an amended complaint.[22]

## CONCLUSION

In accordance with the foregoing, plaintiff's motion for summary judgment is

granted. Fed.R.Civ.P. 56. The third-party defendants' motion (1) to dismiss the complaint for lack of subject matter jurisdiction is denied, Fed.R.Civ.P. 12(b)(1); (2) to dismiss the third-party complaint against Moshe Dankner for insufficiency of service of process is denied, Fed.R.Civ.P. 12(b)(5); (3) to dismiss the third-party complaint against Dankner Diamonds (Israel) Ltd. is granted with leave to defendants to reserve that third-party defendant in accordance with the prior order of this Court; (4) to dismiss the second and fourth causes of action in the third-party complaint for failure to state a claim upon which relief can be granted is denied, Fed.R.Civ.P. 12(b)(6); (5) to dismiss the second and fourth causes of action in the third-party complaint for failure to plead the circumstances constituting fraud with particularity is granted without prejudice, Fed.R.Civ.P. 9(b); and (6) to dismiss the third and fifth causes of action in the third-party complaint for failure to plead the circumstances constituting fraud with particularity is granted without prejudice, Fed.R.Civ.P. 9(b).

The third-party plaintiffs are granted leave to file an amended third-party complaint and to serve process on third-party defendant Dankner Diamonds (Israel) Ltd. within thirty days of the date of this Memorandum and Order.

Plaintiff is directed to file its application for attorneys' fees, containing appropriate affidavits, within twenty days of the date of this Memorandum and Order. Defendants are directed to respond thereto within ten days after plaintiff's application is served.

SO ORDERED.

---

21. Third-Party Complaint, ¶ 16 (filed July 21, 1980).

22. The third-party defendants' motion with respect to the third and fifth causes of action is also cast as a motion to dismiss for failure to state a claim upon which relief can be granted.

Fed.R.Civ.P. 12(b)(6). The Court need not reach this issue at this time, but will reconsider it if the third-party defendants renew their motion following the filing of the amended third-party complaint.